### A06A0100. JOHNSON v. THE STATE.
(631 SE2d 720)

SMITH, Presiding Judge.

Elester Melendez Johnson was indicted with three co-defendants on seven counts of aggravated assault and one count of conspiracy to commit armed robbery. His first trial resulted in a mistrial when the jury could not arrive at a unanimous decision. At his second trial, Johnson was found guilty by the jury on all counts, and a judgment of conviction and sentence were entered. Johnson's motion for new trial was denied, and he appeals, raising six enumerations of error, none of which we find meritorious. We therefore affirm the judgment.

Construed to support the jury's verdict, the evidence presented at trial showed that Shartane Simmons drove Jason Blalock and Michael Robinson from Youngstown, Ohio to Georgia for the purpose of robbing Clayton County drug dealers Corey Lee Hutchens, a/k/a Lee Brown or "Shorty," and Rodrigo Romalho, known as "Rico." Johnson, a/k/a "Red" or "Scoop," drove Blalock and Robinson to Shorty's apartment. Johnson testified that he was going to buy some ecstasy pills from Shorty. When Johnson saw Rico's car parked outside Shorty's apartment he panicked and left the scene because he and Rico had previously argued over a woman and Rico had threatened to kill him.

Blalock and Robinson entered the apartment with at least one gun drawn, stating to Shorty and Rico: "You know what it is." After hearing two gunshots, Rico pulled his own gun from his hip and shot at Robinson several times, hitting him in the body, before realizing he himself had been shot in the leg. A full-scale shootout ensued, with approximately 30 shots being fired in the apartment. Rico kept shooting until he dropped his gun while retreating. He then picked up Robinson's gun and shot Robinson several more times before he escaped out the door, hobbling on one leg. Robinson lay bleeding on the floor of the apartment, shot "numerous times." He was transported to the hospital but died from his wounds.

The police were called, and officers received information that Blalock and Robinson were from Youngstown. Detectives traveled to Youngstown, found Blalock and Simmons, and interviewed them. Both interviews were videotaped. They also interviewed Andre Duncan, a/k/a "Dre" or "Black," who was also from Youngstown but had moved to Georgia and was involved in the robbery as well. All three implicated Johnson in the robbery and were called at trial as witnesses for the State. When they testified and either gave evasive answers to questions regarding Johnson's involvement or testified that he was not involved, the tapes were introduced at trial to impeach them with their prior inconsistent statements.

1. In two enumerations of error, Johnson complains that the trial court erred in permitting the State to impeach Simmons with prior inconsistent statements given during her taped interview. We do not agree.

At trial, Simmons denied that she, Blalock, and Robinson had driven to Georgia to commit the robbery and gave evasive answers when asked whether Johnson was present when the robbery was being planned. She also denied being involved herself, testifying that she did not know of any plan and was not offered a share of the proceeds.

In its direct examination, the State asked Simmons several leading questions, attempting to elicit the information Simmons had provided before. When its attempt failed, the State asked to introduce the taped interview as a prior inconsistent statement. The defense objected, but the trial court overruled the objection.

Johnson argues that the trial court erred in permitting the State to ask leading questions of Simmons and in allowing the taped interview into evidence, because Simmons was the State's own witness, and "[t]he State did not establish surprise, entrapment[,] or inconsistent statements." Johnson further alleges that "[t]he State knew of the unfavorable testimony [of] this witness and . . . intended and planned the impeachment prior to the witness's testimony at trial." Johnson misunderstands the rule set forth in OCGA § 24-9-81. "The impeaching party need not establish *actual* entrapment or surprise. Rather, the party has been 'entrapped' when at the time of the questioning it has knowledge of a prior statement by one of its witnesses which contradicts testimony that witness has just given." (Citations, punctuation and footnotes omitted.) *Black v. State*, 261 Ga. App. 263, 268 (4) (582 SE2d 213) (2003).

Here, Simmons was evasive concerning the facts she had stated in her prior interview and also testified to facts that were inconsistent with those she previously stated in the interview. Because her testimony was inconsistent with her prior interview, the trial court

did not err in permitting the State to ask her leading questions or in permitting the taped interview to be introduced into evidence.

2. In two other enumerations, Johnson makes the same argument with regard to the State's introduction of taped interviews of State's witnesses Blalock and Duncan for impeachment purposes. At trial, Blalock professed ignorance with regard to Johnson's participation in the robbery. In his prior taped statement, however, he told the interviewer that Johnson helped set it up. Duncan implicated Johnson in the robbery in his taped interview. At trial, he testified that he did so only because he was "scared" of the "big . . . detective" who interviewed him. He testified that the detective intimidated him by threatening to "lock my girl up and take my baby away." For the reasons discussed in Division 1, supra, we find no error in the trial court's permitting these videotapes to be played for the jury.

3. Johnson contends the trial court erred in denying his motion for a mistrial, made on the ground that the State knowingly and improperly placed his character in issue when it played the videotape of Blalock's prior interview. The tape was introduced to impeach Blalock's inconsistent testimony. See Division 2, supra. On the tape, Blalock also explained the rift between Rico and Johnson, stating that Johnson had broken into Rico's home and stolen several items.

The decision whether to grant a mistrial based upon improper character evidence rests within the discretion of the trial court. *Dukes v. State*, 273 Ga. 890, 892 (3) (b) (548 SE2d 328) (2001). The State sought to show Johnson's participation in the crimes charged, and this evidence was relevant to the issue of a possible motive for Johnson's participation in the robbery. It also lent credence to Johnson's testimony that he would have entered the apartment with Blalock and Robinson but did not do so when he saw Rico's car. "Evidence which is relevant to an issue in a case is not rendered inadmissible by the fact that it incidentally puts the defendant's character in issue." (Citation and punctuation omitted.) *Parrish v. State*, 237 Ga. App. 274, 281 (6) (514 SE2d 458) (1999).

4. In his final enumeration of error, Johnson asserts that the trial court erred in denying his motion for new trial because his trial counsel provided ineffective assistance. Under the principles set forth in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), to prevail on this claim Johnson was required to show that his trial attorney's performance was deficient and that a reasonable probability exists that but for counsel's deficient performance the outcome of the trial would have been different. *Pearson v. State*, 277 Ga. 813, 816 (5) (596 SE2d 582) (2004).

Johnson does not state specific instances in which his trial counsel's performance was allegedly deficient but states generally that "[w]hen taken as a whole," his trial counsel's representation

"was ineffective and harmful." Johnson and his present counsel appear to take issue with trial counsel's decision to permit Johnson to testify at trial. Appellate counsel concedes that it is "difficult" to retry a case after a mistrial because evidence has been heard before and "both sides are intimately aware of the other's strengths and weaknesses." He acknowledges that the decision for Johnson to testify was a matter of strategy, but asserts that as such it is "unreasonable and untenable." It is well established, however, that

> [t]rial strategy and tactics do not equate with ineffective assistance of counsel. Although another lawyer may have conducted the defense in a different manner and taken another course of action, the fact that defendant and his present counsel disagree with the decisions made by trial counsel does not require a finding that defendant's original representation was inadequate.

(Citations, punctuation and footnote omitted.) *Copeland v. State*, 276 Ga. App. 834, 839 (625 SE2d 100) (2005). Because Johnson did not carry his burden of demonstrating that his trial counsel's performance was deficient, the trial court did not err in denying the motion for new trial made on that ground.

*Judgment affirmed. Ruffin, C. J., and Phipps, J., concur.*

DECIDED MAY 19, 2006.

*Leon Hicks, Joseph R. Baker*, for appellant.
*Jewel C. Scott, District Attorney, Nicholas Salter, Assistant District Attorney*, for appellee.